Filed 6/13/23; Certified for Publication 6/29/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BEATRIZ ADRIANA CURIEL,<br><br>    Defendant and Appellant. | B317814<br><br>(Los Angeles County<br>Super. Ct. No. PA060094)<br><br>**ORDER MODIFYING OPINION**<br><br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

   IT IS ORDERED the opinion in the above-entitled matter filed on June 2, 2023, be modified as follows:


   On page 3, the date "July 10, 2018" shall be replaced with "July 10, 2008."

There is no change in the judgment.

_____
STRATTON, P. J.          WILEY, J.          VIRAMONTES, J.

Filed 6/2/23 (unmodified opinion); Certified for Publication 6/29/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B317814 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA060094) |
| v. | |
| BEATRIZ ADRIANA CURIEL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County. David B. Walgren, Judge. Reversed and remanded with directions.

Christopher L. Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Noah P. Hill and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Beatriz Curiel appeals from the order denying her motion to withdraw her no contest plea and vacate her convictions under Penal Code[1] section 1473.7, subdivision (a). Curiel contends the trial court erred in denying her motion because she demonstrated she did not meaningfully understand the adverse immigration consequences of her plea, and it is reasonably probable she would have rejected the plea had she understood those consequences. We conclude Curiel satisfied her burden of establishing that she is entitled to relief under section 1473.7. We accordingly reverse the order denying Curiel's motion and remand to the trial court with directions to grant the motion and vacate the convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Charges

In a seven-count information filed on February 26, 2008, Curiel and her husband, Saul Desantiago, were each charged with two counts of identity theft (§ 530.5, subd. (a); counts 1–2), one count of making a false financial statement (§ 532a, subd. (1); count 3), two counts of possession of a forged driver's license (§ 470b; counts 4–5), and two counts of grand theft auto (§ 487, subd. (d)(1); counts 6–7). On March 5, 2008, Curiel was arraigned and pleaded not guilty to all counts.

According to a preplea probation officer's report, Curiel and Desantiago were accused of using the personal identification information and paycheck stub of Luz Salazar to purchase two vehicles from a car dealer, Vic's Motors. Desantiago had been Salazar's real estate agent, and he obtained Salazar's personal

---

[1] Unless otherwise stated, all further statutory references are to the Penal Code.

2

information while representing her in the purchase of her home. After the home went into foreclosure due to Desantiago's poor business dealings, he threatened Salazar and her husband that "something bad would happen" to them if they went to police. Salazar was afraid of Desantiago, and she later obtained a restraining order against Desantiago and Curiel. During the investigation, the police discovered that Curiel also had a driver's license issued in another person's name.

At the time of her arrest, Curiel had no criminal history. The report stated that Curiel may have been influenced by Desantiago to participate in the criminal plot, and that she had shown poor judgment in going along with her husband's scheme. The detective in charge of the investigation told the probation officer that Desantiago "needs to be watched," and that Curiel "was just stupid," indicating that Desantiago, not Curiel, had orchestrated the crime. The detective was not opposed to probation for Curiel.

## II. The No Contest Plea

At a July 10, 2018 hearing, the prosecutor informed the trial court that both Curiel and Desantiago had agreed to a negotiated plea. The prosecutor originally offered each of them a plea requiring 180 days in county jail, but accepted the counteroffer made by the defendants' attorneys. In exchange for pleading no contest to counts 1, 3, and 6, Curiel would be sentenced to three years of probation and 45 days of Caltrans service, and Desantiago would be sentenced to 90 days in county jail and 90 days of Caltrans service. Both defendants would be joint and severally liable to pay restitution to Vic's Motors in the amount of $11,396 prior to sentencing. If they failed to make full restitution, they would each receive a sentence of 90 days in

3

county jail and 90 days of Caltrans service, or alternatively, 180 days in county jail.  The prosecutor noted that Curiel's sentence of probation was "based on the fact she has no priors and is a primary caretaker of the couple's . . . six children."

Prior to entering into the plea, Curiel signed a four-page plea form, commonly known as a *Tahl* waiver.  (*In re Tahl* (1969) 1 Cal.3d 122, overruled on other grounds by *Mills v. Municipal Court* (1973) 10 Cal.3d 288, 291.)  She also initialed the boxes next to paragraphs on the form acknowledging that she understood and agreed to the terms of the plea, the advisements and waivers of her rights, and the consequences of the plea. One of the paragraphs stated:  "Immigration Consequences— I understand that if I am not a citizen of the United States, I must expect my plea of guilty or no contest will result in my deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty."  Another paragraph provided:  "Prior to entering this plea, I have had a full opportunity to discuss with my attorney the facts of my case, the elements of the charged offense(s) and enhancement(s), any defenses that I may have, my constitutional rights and waiver of those rights, and the consequences of my plea."  On the last page of the form, Curiel signed an acknowledgment stating that she had "read and initialed each of the paragraphs above and discussed them with my attorney," and that her initials "mean that I have read, understand and agree with what is stated in the paragraph."

Curiel's privately retained attorney, Arvand Naderi, also signed an acknowledgment on the plea form, which stated, among other things, that he had "reviewed this form with my client" and "discussed . . . the consequences of the plea."

4

In addition, a duly sworn Spanish-language interpreter signed an acknowledgment indicating that she had translated this form to the defendant, and that defendant had "stated that he or she understood the contents on the form."

At the plea hearing, Curiel was present, represented by Naderi, and assisted by a Spanish-language interpreter. Prior to taking the plea, the trial court asked Curiel whether she had enough time to discuss the case and the plea agreement with her counsel, and whether her counsel had explained the nature of the charges, any possible defenses, and the consequences of the plea. Curiel answered affirmatively. Curiel further confirmed that she had reviewed the plea form with the assistance of the interpreter, and had signed and initialed the form to indicate that she understood its contents.

The trial court reiterated the waiver of rights and the consequences of the plea set forth in the form, including that "[i]f you are not a citizen of the United States you must expect that your plea of guilty or no contest will result in your deportation, exclusion from admission or reentry into the United States and denial of naturalization and amnesty." When asked if she understood this consequence, Curiel answered, "Yes." The court also inquired, "Do you have any questions about the forms, anything I've said, anything your attorneys have said, the charges, anything the prosecutor said, anything whatsoever? Now is the time to ask." Curiel answered, "No." Both Curiel and Desantiago entered a no contest plea to counts 1, 3, and 6, and the court accepted the pleas.

The sentencing hearing was held on February 2, 2009. The trial court indicated it had received a signed letter from a representative of Vic's Motors, stating that the defendants had

5

purchased a car from the dealer, which settled the amount owed as restitution. Based on that letter, the court ruled that the restitution had been paid in full. In accordance with the plea agreement, Curiel was sentenced to three years of probation and 45 days of Caltrans service. Desantiago was sentenced to three years of probation, 90 days in the county jail, and 90 days of Caltrans service. They each received one day of custody credit for time served. The court advised both defendants that if they left or were deported from the United States, they were not to reenter illegally, and they were to report to their probation officer within 72 hours of their reentry.

In 2017, Curiel successfully moved to expunge her 2008 convictions under section 1203.4.

## III.    The Motion to Vacate the Convictions

On September 10, 2021, more than 12 years after her no contest plea, Curiel filed a motion to withdraw the plea and to vacate her convictions under section 1473.7. Curiel argued that she did not meaningfully understand the adverse immigration consequences of her plea because her former attorney, Naderi, failed to properly advise her of those consequences.

Curiel supported her motion with, among other documents, her own signed declaration. As set forth in her declaration, Curiel was referred to Naderi by her husband's defense counsel, Feliz Martinez. At Curiel's first meeting with Naderi, he inquired about her immigration status. When Curiel informed Naderi that she did not have legal status in the United States, he told her that "he would do what he could to avoid jail time." Curiel's husband, Desantiago, who was a lawful permanent resident, was advised to assume the majority of the responsibility for the crime. As a result, the plea agreements required

6

Desantiago to serve jail time while Curiel only had to perform community service with Caltrans.  They also had to pay over $10,000 in restitution.  Both Curiel and Desantiago were assured that "these were good plea bargains," and that they should accept them.  Neither of them were told whether there were any immigration consequences associated with their pleas.  They "presumed there were not any and that [they] were only looking at the possibility of jail time."

Desantiago later applied to become a United States citizen so that he could petition for Curiel to gain lawful status.  In anticipation of helping Curiel become a lawful resident, Desantiago approached his prior counsel, Martinez, about "the possibility of cleaning up his record."  Martinez assured Desantiago that he could assist him, and he advised Curiel to approach Naderi for the same purpose.  In 2017, both Curiel and Desantiago paid their former defense attorneys to file paperwork to expunge their convictions.  Curiel did not realize at the time that the expungement had no beneficial effect with respect to her immigration status.

After her husband applied for citizenship with the federal government, Curiel learned that both she and Desantiago had pleaded to aggravated felonies.  Due to the nature of the convictions, the couple's immigration attorney advised Desantiago to withdraw his application.  Desantiago later died.  Following his death, Curiel was advised by the immigration attorney that she still might be able to gain lawful status through her adult daughter, and that her mother could apply for an unlawful presence waiver on her behalf.  However, to be eligible for a change in status, Curiel would have to address her convictions.  In her declaration, Curiel stated that if she had been

7

informed of how the convictions would affect her ability to gain lawful status and to defend herself in immigration court, she never would have agreed to the plea, even if it meant serving jail time.

Curiel also supported her motion with a signed declaration from her immigration counsel, Guillermo Carrillo. According to his declaration, Carrillo was retained to represent Curiel in her efforts to legalize her presence in the United States. When Carrillo contacted Naderi in 2021 about his prior representation of Curiel, Naderi indicated that he no longer had a copy of Curiel's case file because so much time had passed, but he still had a good recollection of Curiel and her husband. In a series of conversations with Carrillo, Naderi initially was incredulous about the fact that Curiel's convictions constituted an aggravated felony and a crime of moral turpitude for immigration purposes. While Naderi expressed concern for Curiel, it was evident to Carrillo that he "did not understand the technical aspect of how Ms. Curiel's criminal matter interacted with immigration law."

Naderi later requested that Carrillo draft a declaration for his review. Carrillo sent Naderi a copy of a proposed declaration, which stated, among other things, that Naderi did not recognize the immigration consequences associated with Curiel's plea at the time of his representation, and that if he had recognized those consequences, he would have counseled his client differently. After reviewing the draft declaration, Naderi informed Carrillo that he had spoken with his attorney and "cannot sign that document."

The People filed an opposition to the motion to vacate the convictions. The People argued that Curiel was fully advised of the immigration consequences of her plea because she signed a

*Tahl* waiver acknowledging that she understood the mandatory immigration consequences, and she then confirmed her understanding of those consequences in a colloquy with the court. The People also asserted that Curiel's statements in her declaration were self-serving and contrary to the written and oral advisements that she received at the time of her plea. The People supported the opposition with Curiel's *Tahl* waiver, transcripts of her plea and sentencing hearings, and the probation officer's report.

## IV.    The Hearing and Ruling on the Motion

On December 20, 2021, the trial court held an evidentiary hearing on Curiel's motion. Curiel called her former defense attorney, Naderi, to testify. According to his testimony, Naderi solely practiced criminal defense, and had been doing so since 2004. He did not remember if he ever discussed Curiel's immigration status with her. He also did not remember if he knew whether Curiel was a United States citizen, or if he recommended that she speak with an immigration attorney before entering into the plea. His normal practice, however, was to advise noncitizen clients to consult with immigration counsel. He sometimes researched the law on immigration consequences, and he had attended seminars on the subject, but he could not recall if he did so before 2008.

Naderi did not remember how much Curiel had to pay in restitution as part of her plea agreement. He currently was aware that an aggravated felony under federal immigration law includes an offense involving fraud or deceit in which the loss to the victim exceeds $10,000. He did not recall if he was aware of this definition of an aggravated felony at the time of Curiel's plea.

9

He also did not recall if he attempted to negotiate a lesser amount of restitution in this case.

On cross-examination, Naderi agreed that restitution was a constitutional and statutory right that could not be bargained away, and that negotiating a lesser amount of restitution than the actual loss would have been "illegal." Naderi also agreed that various offenses including auto theft, identity theft, forgery, and fraud were crimes of moral turpitude. He was not aware of any crime not involving moral turpitude that would cover the facts of this case. Naderi confirmed that he signed the attorney acknowledgment in Curiel's *Tahl* waiver. He further testified that he would not sign a plea form, or allow an interpreter to sign such a form, if the facts stated in the acknowledgments were not true. He also would not allow a defendant to initial the box on the form pertaining to the immigration consequences of a plea if he had not reviewed that paragraph with the defendant. Naderi could not recall whether the prosecutor's original plea offer required jail time for Curiel. He agreed, however, that the negotiated plea was a fair disposition given that Curiel was the primary caregiver for her children. Naderi believed that he had no legal defense to the charges, and that Curiel would have faced the same immigration consequences if she were convicted at a trial.

On redirect, Naderi admitted that he did not know if he could have negotiated a plea for Curiel in which the amount of restitution was divided among the charges to which she was pleading so that no single count would require a restitution payment above $10,000. He also conceded that Curiel could have paid a portion of the restitution prior to entering her plea so that the amount owed at the time of the plea would not have exceeded

10

$10,000.  In other cases, Naderi's clients sometimes paid restitution before entering their pleas if the prosecutor agreed to those terms.  Although Naderi had asked the prosecutor in Curiel's case to agree to a plea that did not include jail time, he could not recall if he attempted to negotiate the terms of restitution.

Naderi testified that he did not sign the declaration sent to him by Curiel's immigration attorney because it was inaccurate and would have been a fraud on the court for him to sign it.  When asked if he thought that staying out of jail would shield a noncitizen defendant from immigration consequences, Naderi answered:  "I think it's different now.  But years ago, if someone did not have their paperwork in order, [Immigration and Customs Enforcement (ICE)] would place holds on them, and ICE would pick them up from these local facilities and then deport them."  Naderi did not know if avoiding jail time could have kept Curiel free of immigration consequences, but stated that "if she's not in jail, ICE could not put a hold on her."  Naderi admitted that it was possible he told Curiel that if she avoided jail, it was less likely there would be adverse immigration consequences, such as deportation, inadmissibility for entry, and denial of amnesty, but he could not recall their exact conversation.

At the hearing, Curiel also testified on her own behalf.  According to her testimony, she was born in Mexico and had been living in the United States for the past 32 years since she was about 14 years old.  Curiel has six children, all of whom are United States citizens and were born prior to her arrest.  Curiel's mother is a lawful permanent resident and her five siblings legally reside in the United States.  Curiel's husband,

11

Desantiago, was also a lawful permanent resident, and he filed an immigration petition on her behalf before he died.

Curiel hired Naderi to represent her in her criminal case. She met with him in his office about two times. Because Curiel spoke little English and Naderi did not speak Spanish, Naderi's secretary served as a translator, but she did not speak Spanish well. Before entering her plea, Curiel told Naderi that she was not a United States citizen, and that she was concerned about the immigration consequences of the plea. In response, Naderi told Curiel "not to worry about going to jail because that was the only way [she] would have contact with immigration." Naderi never informed Curiel that she might not be able to gain lawful status in the future regardless of whether she served jail time, nor did he advise her to consult with an immigration attorney. Curiel believed that if she stayed out of jail, she could avoid any immigration consequences.

Curiel agreed to the no contest plea based on Naderi's recommendation. At the time she entered the plea, she knew she would not be serving any jail time under the terms of the agreement. In connection with her plea, Curiel initialed and signed the *Tahl* waiver, including placing her initials next to the paragraph pertaining to the immigration consequences of the plea. At that time, Curiel did not think this paragraph applied to her "because she was not going to jail," and Naderi never told her otherwise.

Naderi later advised Curiel that he could arrange for her conviction to be expunged, and that she would then be able to apply for lawful residence. Curiel hired Naderi to file the necessary paperwork. It was not until Curiel consulted with her current immigration counsel about applying for lawful

12

permanent residence that she learned her plea precluded her from gaining lawful status.

At the time of her plea, Curiel wanted to stay out of jail because she had six-month-old twins that she could not leave alone. However, if Curiel had been able to obtain a plea that would allow her to gain lawful status in the future, she would have been willing to serve jail time. Curiel did not know at the time of her plea that her convictions would make her ineligible to become a lawful resident for the rest of her life, and if she had such knowledge, she would have done whatever she could to preserve her eligibility in the future.

On cross-examination, Curiel confirmed that avoiding jail was important to her at the time of her plea because she was the primary caregiver for her young children. She stated that she hired an attorney so that she could avoid jail time, but she would have been willing to go jail "if it was to clean up [her] record." Curiel also admitted that, at the time of her plea, she was "told the exact immigration consequences" in the form that she initialed and signed, and that the court also "told [her] on the record specifically [she] will be deported." When asked why she would state in a sworn declaration that she was never told the immigration consequences of her plea when the record showed that she had been given both written and oral advisements, Curiel testified, "Because from the very beginning I trusted in what my attorney had told me, and he never told me that I was going to have immigration consequences. He never indicated that I should consult an immigration attorney." Curiel denied that she had lied in her declaration. She stated that the fact that she went back to Naderi years later "so that he could take care of fixing [her] record" substantiated her claim that she did not

13

understand the immigration consequences of her plea. Curiel acknowledged that she had not been deported to date, nor had she been notified by any federal agency that she was about to be deported. At the conclusion of the testimony, the parties stipulated that Curiel had not had any contact from immigration authorities concerning deportation.

After hearing the argument of counsel, the trial court denied Curiel's motion. In issuing its ruling, the court stated: "The court is sympathetic to the position she finds herself in. However, the fact remains that every single piece of contemporaneous evidence shows that she was fully advised, fully accepted the consequences, indicated the consequences were explained to her, indicated that she understood she would be deported. She initialed the box saying she would be deported in the *Tahl* waiver and also signed the form saying 'My initials mean that I have read, understand, and agree with what is stated,' namely, that she is going to be deported. [¶] The court advised her in addition to the *Tahl* waiver. During the plea she acknowledged Mr. Naderi had explained the consequences of her plea. She said she understood she would be deported. [¶] There was no prejudicial error, and I think the statements today are self-serving and not credible. And the court is also troubled, in evaluating her credibility, that she would so freely submit a declaration under penalty of perjury saying she was never informed of the immigration consequences and signs that declaration under penalty of perjury when the record is so abundantly clear that that is a false statement in her very own declaration. [¶] So I do think the case was handled properly. She was advised multiple times. She acknowledged she was advised. There was no prejudicial error. She fully understood the nature

of the plea as well as the consequences and immigration consequences, more specifically. [¶] So I do not believe the defense has met their burden, and for that reason the motion is denied."

Curiel filed a timely appeal.

## DISCUSSION

On appeal, Curiel contends the trial court erred in denying her section 1473.7 motion. She argues the motion should have been granted because she met her burden of establishing that she did not meaningfully understand the immigration consequences of her plea, and that there is a reasonable probability she would not have accepted the plea if she had understood its immigration consequences. Based on our independent review of the record, we conclude that Curiel is entitled to relief under section 1473.7.

## I.    Governing Law

Section 1473.7 allows noncitizens who are no longer in criminal custody to move to vacate a conviction if they can establish, by a preponderance of the evidence, that the conviction is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence." (§ 1473.7, subd. (a)(1).) "A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel." (*Ibid.*)

To prevail on a motion under section 1473.7, a defendant must satisfy two elements. "The defendant must first show that he did not meaningfully understand the immigration consequences of his plea. Next, the defendant must show that his misunderstanding constituted prejudicial error." (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).) "[P]rejudicial

15

error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences." (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*).)  If the defendant meets his burden of establishing prejudicial error, the court must grant the motion and allow the defendant to withdraw the plea.  (*Id.* at p. 523.)

We apply an independent standard of review to evaluate whether a defendant is entitled to relief under section 1473.7. (*Espinoza*, *supra*, 14 Cal.5th at p. 319; *Vivar*, *supra*, 11 Cal.5th at p. 527.)  Under this standard, " 'an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' " (*Vivar*, at p. 527.)  The appellate court must give deference to the trial court's factual findings if they are based on " ' "the credibility of witnesses the [superior court] heard and observed." ' " (*Ibid*.)  However, "courts reviewing such claims generally may ' "reach a different conclusion [from the trial court] on an independent examination of the evidence . . . even where the evidence is conflicting." ' " (*Ibid*.)  In cases where the trial court's factual findings "derive entirely from written declarations and other documents," the trial court and the reviewing court " 'are in the same position,' " and no deference is owed.  (*Id.* at p. 528.)  Accordingly, in determining whether the trial court erred in denying a motion to vacate a conviction, "it is for the appellate court to decide, based on its independent judgment, whether the facts establish prejudice under section 1473.7." (*Ibid*.)

## II.    Immigration Consequences of Curiel's Plea

Under the terms of her 2008 plea agreement, Curiel pleaded no contest to one count of identity theft (§ 530.5, subd. (a)), one count of making a false financial statement

16

(§ 532a, subd. (1)), and one count of grand theft auto (§ 487, subd. (d)(1)).  Her sentence of three years of probation and 45 days of community service was contingent upon making full restitution to Vic's Motors in the amount of $11,396.  The restitution amount reflected the value of the two vehicles that Curiel and her husband purchased from Vic's Motors using unlawfully obtained personal identifying information.

The parties do not dispute that, under federal immigration law, Curiel's convictions for identity theft and making a false financial statement constitute aggravated felonies regardless of the length of the sentence because they involve crimes of fraud or deceit coupled with a loss to the victim of more than $10,000. (8 U.S.C. § 1101(a)(43)(M)(i); see *Kawashima v. Holder* (2012) 565 U.S. 478, 484 ["[a]nyone who is convicted of an offense that 'involves fraud or deceit in which the loss to the victim or victims exceeds $10,000' has committed an aggravated felony"].)  The parties also do not dispute that Curiel's convictions for making a false financial statement and grand theft auto qualify as crimes of moral turpitude under federal immigration law.  (8 U.S.C. § 1182(a)(2)(A)(i)(I); see *Tijani v. Holder* (9th Cir. 2010) 628 F.3d 1071, 1075–1076 [making a false financial statement is a crime of moral turpitude]; *Rashtabadi v. INS* (9th Cir. 1994) 23 F.3d 1562, 1568 [grand theft is a crime of moral turpitude].)

When committed by a noncitizen, both types of criminal offenses—aggravated felonies and crimes of moral turpitude— carry adverse immigration consequences.  A noncitizen who is convicted of an aggravated felony is subject to mandatory deportation and permanent exclusion from the United States. (8 U.S.C. §§ 1227(a)(2)(A)(iii), 1228(c); *Moncrieffe v. Holder* (2013) 569 U.S. 184, 187–188.)  An aggravated felony conviction also

17

renders a noncitizen ineligible for certain types of discretionary relief from deportation, such as asylum and cancellation of removal. (8 U.S.C. § 1229b(a)(3), (b)(1)(C); *Moncrieffe*, at p. 187.) In addition, a noncitizen without lawful status who is convicted of a crime of moral turpitude is ineligible for admission to the United States as well as cancellation of removal. (8 U.S.C. §§ 1182(a)(2)(A)(i)(I), 1229b(b)(1)(C); *Pereida v. Wilkinson* (2021) ___U.S.___ [141 S.Ct. 754, 760–761].) Therefore, even though Curiel had no contact with immigration authorities when she sought relief under section 1473.7, each of the offenses to which she pleaded no contest left her subject to potential adverse immigration consequences in the future.

## III. Curiel Showed She Did Not Meaningfully Understand the Immigration Consequences of Her Plea

In moving to vacate her convictions under section 1473.7, Curiel argued that she did not meaningfully understand the adverse immigration consequences of her plea because her defense counsel, Naderi, failed to properly advise her of those consequences. In particular, Naderi never told Curiel that the offenses to which she was pleading no contest would subject her to deportation regardless of whether she served any jail time. He also did not explain to Curiel that the convictions would render her ineligible to seek relief from deportation or to gain lawful status in the future. As evidentiary support for her motion, Curiel relied on her written declaration, her oral testimony at the hearing on her motion, and the oral testimony of Naderi.

In denying the motion, the trial court found that both the written advisements in Curiel's signed *Tahl* waiver and the oral advisements given by the court at the plea hearing showed that Curiel fully understood the immigration consequences of her

18

plea, "namely, that she is going to be deported." The court also found that Curiel's "statements today are self-serving and not credible." The court indicated that it was particularly "troubled" by the statement in Curiel's declaration that she was never informed of the immigration consequences, and found that statement was "false" because it contradicted the advisements that Curiel indisputably received at the time of the plea. Because the trial court held an evidentiary hearing on Curiel's motion, we accord deference to the credibility findings made by the court based on the testimony given at that hearing. (*Vivar*, *supra*, 11 Cal.5th at p. 527.) Nevertheless, we reach a different conclusion from the trial court based on our independent examination of the evidence. (*Ibid*.)

It is undisputed that, both in the written *Tahl* waiver that Curiel signed and in her plea colloquy with the court, she was advised that if she was not a United States citizen, she "must expect" that her plea "will result" in her "deportation, exclusion from admission or reentry to the United States, and denial of naturalization and amnesty." However, as this court explained in considering a *Tahl* waiver with similar mandatory deportation language, the fact that the defendant initialed and signed the waiver "did not absolve defense counsel of the duty to advise of immigration consequences." (*People v. Manzanilla* (2022) 80 Cal.App.5th 891, 906 (*Manzanilla*).) "Even where the form says that the defendant 'will' be deported, it does not substitute for the advice of counsel, and it is not a categorical bar to relief." (*Ibid*.; accord, *People v. Lopez* (2021) 66 Cal.App.5th 561, 577 [" 'Although the *Tahl* form contains the word "will" and not "may," it . . . "is not designed, nor does it operate, as a substitute for such advice" of defense counsel regarding the applicable

19

immigration consequences in a given case' "].)  Likewise, a trial court's " 'generic advisement' " to a defendant that deportation " '*will* result' " is not a substitute for counsel's advice.  (*Lopez*, at p. 577.)  "A proper advisement by the court does not foreclose the possibility of relief when counsel provides inaccurate or incomplete advice regarding immigration consequences."  (*Id*. at p. 578.)  Thus, in evaluating whether the defendant is entitled to relief under section 1473.7, " ' " ' "[t]he defendant can be expected to rely on counsel's independent evaluation of the charges" ' " ' rather than the generic statements in the *Tahl* waiver and plea colloquy."  (*Manzanilla*, at p. 906.)

Here, the fact that the *Tahl* waiver and the court's colloquy advised Curiel that she "must expect" her plea "will result" in deportation did not preclude her from demonstrating that she did not meaningfully understand the immigration consequences of her plea.  (See *Manzanilla*, *supra*, 80 Cal.App.5th at pp. 899, 910 [rejecting claim that defendant's signature on *Tahl* waiver that stated " 'I must expect my plea . . . will result in my deportation' " showed he subjectively understood he would be deported]; *People v. Rodriguez* (2021) 60 Cal.App.5th 995, 1003–1004 [defendant did not meaningfully understand immigration consequences despite signing form that stated " 'this plea . . . *will* result in my removal/deportation' "]; *People v. Camacho* (2019) 32 Cal.App.5th 998, 1011, fn. 8 [even though defendant "was advised that his plea '*will* result' . . . in adverse immigration consequences," he presented sufficient evidence of his lack of understanding to warrant section 1473.7 relief].)  "Rather, the inquiry under section 1473.7 requires consideration of the 'totality of the circumstances,' which necessarily involves case-by-case examination of the record [citation], and no specific kind of

evidence is a prerequisite to relief." (*Espinoza*, *supra*, 14 Cal.5th at p. 325.) Moreover, in deciding whether the defendant has shown error, the focus of our inquiry is on the defendant's own error in misunderstanding the immigration consequences of the plea. (*People v. Alatorre* (2021) 70 Cal.App.5th 747, 769 ["the 'error' is that the petitioner subjectively misunderstood the immigration consequences of the plea"]; *People v. Mejia* (2019) 36 Cal.App.5th 859, 871 ["the focus of the inquiry in a section 1473.7 motion is on the '*defendant's own error* in . . . not knowing that his plea would subject him to mandatory deportation' "].)

Even deferring to the trial court's credibility findings at the evidentiary hearing and disregarding Curiel's oral testimony about whether she was advised of the immigration consequences of her plea, the remaining evidence was sufficient to show that Curiel did not meaningfully understand those consequences at the time of the plea. In her written declaration, which we independently review, Curiel stated that she told Naderi at their first meeting that she did not have legal status in the United States, and in response, Naderi said that "he would do what he could to avoid jail time." Curiel also stated that both she and her husband were assured by their defense attorneys that "these were good plea bargains," which they should accept. Neither Curiel nor her husband "were told what the immigration consequences associated with [their] guilty pleas would be," and as a result, they "presumed" there were not any immigration consequences and they "were only looking at the possibility of jail time." It was not until her husband applied for citizenship so that Curiel could gain lawful status that they learned from immigration counsel that they pleaded to aggravated felonies and were subject to deportation.

In his testimony at the hearing, Naderi could not recall if he knew whether Curiel was a United States citizen, or if he discussed her immigration status with her. He also could not recall if he advised her to consult with an immigration attorney. With respect to Curiel's plea agreement, Naderi could not recall if he made any effort to negotiate the terms of restitution as part of the plea, or if he even knew at the time that a crime involving fraud or deceit where the victim's loss exceeds $10,000 constituted an aggravated felony under federal immigration law. While Naderi was unable to recall any details of his conversations with Curiel, he testified that his understanding of the law in 2008 was that, when undocumented immigrants went to jail, ICE would place a hold on them and then deport them. He further admitted that he may have told Curiel that if she avoided jail, she would have fewer chances of facing adverse immigration consequences such as deportation, exclusion, and denial of amnesty.

Naderi's testimony thus corroborated the statements in Curiel's declaration that the only advice she received from her defense attorney about how the criminal charges might impact her immigration status related to avoiding jail time. While Naderi's advice may have been technically correct in that Curiel was less likely to have contact with immigration authorities if she remained out of jail, it was inadequate and incomplete. It omitted any explanation of the fact that Curiel's plea would subject her to mandatory removal and exclusion from reentry, and effectively bar her from gaining lawful status in the future. Naderi's failure to give accurate and complete advice about the specific consequences of the plea agreement helps explain why Curiel mistakenly believed that, because her plea did not include

22

a jail sentence, it did not carry a risk of any adverse immigration consequences.  (See *People v. Camacho, supra*, 32 Cal.App.5th at p. 1009 [defendant's "own error in believing that a . . . plea calling for no time in custody would avoid making him deportable" was supported by attorney's testimony that "he told defendant only that the charge *could* subject him to deportation and that 'we're going to get it . . . expunged early and maybe that will help' "].)

Curiel's subjective misunderstanding of the immigration consequences of her plea is further corroborated by the fact that, about 10 years after she and her husband entered into the pleas, they retained their former defense attorneys to help them get their convictions expunged so that Desantiago could apply for citizenship and petition for Curiel to become a lawful resident. They did not learn that the expungements had no effect on the immigration consequences of their pleas until sometime after Desantiago submitted an application for naturalization to the federal government, which he then had to withdraw due to the disqualifying nature of the convictions.  (See *Ramirez-Castro v. INS* (9th Cir. 2002) 287 F.3d 1172, 1175 [a conviction expunged under section 1203.4 remains a conviction for purposes of federal law].)  The couple's postplea conduct in seeking citizenship for Desantiago and lawful residence status for Curiel was not consistent with that of individuals who understood that their convictions made them presumptively deportable and ineligible for reentry into the United States.  (See *Espinoza, supra*, 14 Cal.5th at p. 320 [defendant "took an international commercial flight to the United States, which predictably required subjecting himself to the scrutiny of United States immigration officials, which is not consistent with the behavior of a person who understood that his convictions effectively ended his lawful

23

resident status"]; *People v. Alatorre, supra*, 70 Cal.App.5th at p. 770 ["[i]t goes without saying that someone who understood his criminal conviction made him automatically deportable would not voluntarily contact immigration authorities and advise them of his presence"].)

In sum, based on the totality of the record, Curiel met her burden of establishing that she did not meaningfully understand the consequences of her plea at the time she entered into it.

## IV. Curiel Showed Her Misunderstanding Constituted Prejudicial Error

To establish prejudicial error under section 1473.7, "a defendant must demonstrate a 'reasonable probability that [he or she] would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.' " (*Espinoza, supra*, 14 Cal.5th at p. 316.) In determining whether there is a reasonably probability the defendant would have rejected the plea, courts must "consider the totality of the circumstances." (*Vivar, supra*, 11 Cal.5th at p. 529.) "Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Id.* at pp. 529–530.) "These factors are not exhaustive, and no single type of evidence is a prerequisite to relief." (*Espinoza*, at p. 321.)

"Reasonable probability" does not mean more likely than not, " ' "but merely a reasonable chance, more than an abstract possibility." ' " (*People v. Soto* (2022) 79 Cal.App.5th 602, 610.) It is not enough for the defendant simply to declare that he or she

24

would not have accepted a plea that would result in deportation. (*Vivar*, *supra*, 11 Cal.5th at p. 529.)  Rather, the defendant must "corroborate such assertions with 'objective evidence.' " (*Id.* at p. 530.)  "Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.)

Considering the totality of the circumstances in this case, we conclude that Curiel made a showing of prejudice.  It is undisputed that Curiel has deep and long-standing ties to the United States.  She immigrated to the country when she was 14 years old, and at the time of her plea, she had been living here for almost 20 years.  Prior to his death, her husband was a lawful permanent resident.  Each of their six children is a United States citizen and was born before Curiel entered into the plea.  In addition, Curiel's mother and five siblings are all lawful residents of the United States.  As our Supreme Court explained, "[t]ies to the United States are an important factor in evaluating prejudicial error under section 1473.7 because they shed light on a defendant's immigration priorities." (*Espinoza*, *supra*, 14 Cal.5th at p. 321; see, e.g., *People v. Villalba* (2023) 89 Cal.App.5th 659, 674 [finding prejudice where defendant came to the United States as a child, met and married his wife here, and raised six children, all United States citizens]; *People v. Soto*, *supra*, 79 Cal.App.5th at p. 611 [finding prejudice where defendant lived in the United States since he was a teenager in the late 1980's and his children and family lived here]; *People v. Mejia*, *supra*, 36 Cal.App.5th at p. 872 [finding prejudice where defendant had been living in the United States since he was

25

14 years old, and his wife and infant son lived here, as well as his mother and six siblings].)

The record also reflects that Curiel's primary consideration in seeking a plea bargain was to ensure that she was available to care for her six children, including her then six-month-old twins. As Curiel testified at the evidentiary hearing on her motion, "My children are the most important thing to me." In opposing the motion, the People argued that, because Curiel was the primary caregiver for her children, her priority in accepting the plea was to avoid jail time rather than any immigration consequences. It does not make sense, however, that Curiel would have agreed to a plea deal that kept her out of jail so that she could remain her children's caregiver, but placed her at risk of mandatory deportation and thus permanent separation from her children, who resided in the United States. Rather, it is reasonable to infer that Curiel's paramount concern in seeking a plea was to remain in the United States where she could continue raising her children, including her infant twins. (See *People v. Rodriguez* (2021) 68 Cal.App.5th 301, 326 [defendant's prompt acceptance of a plea deal that allowed her to return to her family, including her two small children, indicated that "she would have done all she could to avoid pleading no contest to a charge that would lead to her mandatory deportation and separation from her family for the rest of her life"].)

The evidence also showed that Curiel had no prior criminal record at the time of her plea. As our Supreme Court recognized, "[t]his fact is relevant because a defendant without an extensive criminal record may persuasively contend that the prosecutor might have been willing to offer an alternative plea without immigration consequences." (*Espinoza, supra,* 14 Cal.5th at

26

p. 324.)  At the hearing on the motion, Curiel's immigration counsel argued that there were alternative pleas that would not have carried the same adverse immigration consequences, while leaving intact the bargained-for sentence of probation, community service, and restitution.  Curiel details these alternative plea arrangements in her briefing on appeal.

For instance, with respect to the aggravated felonies, Curiel asserts that Naderi could have proposed a plea deal that explicitly tied the restitution owed on the two cars to the two grand theft auto counts by assigning the value of each car to its respective count, and requiring Curiel to enter into a *Harvey* waiver so that any dismissed counts could be considered for purposes of restitution.  (*People v. Harvey* (1979) 25 Cal.3d 754.)  Under this scenario, Curiel still would have been liable for full restitution, but the amount owed as to any single count would have been less than $10,000, the threshold figure for an aggravated felony.  With respect to the crimes of moral turpitude, Curiel contends that Naderi could have sought a plea deal that required her to plead no contest to the two counts of identity theft, which is not a categorical crime involving moral turpitude under federal immigration law.  (See *Linares-Gonzalez v. Lynch* (9th Cir. 2016) 823 F.3d 508, 518–519.)  Naderi also could have tried to negotiate a plea to other factually related, uncharged offenses that are not considered crimes of moral turpitude for purposes of federal immigration law, such as second degree commercial burglary (§ 459).  (See *Lara-Garcia v. Garland* (9th Cir. 2022) 49 F.4th 1271, 1281.)

The People argue that the record fails to demonstrate that any of these proposed plea deals would have been offered by the prosecutor or accepted by the court.  The People also assert that

27

there is nothing in the record to show that Curiel had a viable defense to the charges, or any reason to believe she could have received a better resolution if convicted after a trial.  In assessing prejudice, however, the focus is on " 'what the defendant would have done, not whether the defendant's decision would have led to a more favorable result.' " (*Vivar*, *supra*, 11 Cal.5th at pp. 528–529.)  "A decision to reject a plea bargain . . . 'might be based either on the desire to go to trial or on the hope or expectation of negotiating a different bargain without immigration consequences.' [Citation.]  When a court weighs whether a defendant would have taken the latter path, it need not decide whether the prosecution would actually 'have offered a different bargain'—rather, the court should consider 'evidence that would have caused *the defendant* to expect or hope a different bargain would or could have been negotiated.' " (*Id*. at p. 529.)

On this record, we conclude there is at least a reasonable probability that Curiel "could have tried 'to obtain a better bargain that [did] not include immigration consequences.' " (*Vivar*, *supra*, 11 Cal.5th at p 531.)  Curiel's deep ties to the United States, her lack of a criminal record, her undisputed role as the primary caregiver for her children, and the possibility of a plea bargain with less severe immigration consequences provide sufficient corroboration for her claim that she would have rejected the plea if she had meaningfully understood its adverse immigration consequences.  Because Curiel met her burden of demonstrating prejudicial error, she is entitled to relief under section 1473.7.

28

## DISPOSITION

The order denying Curiel's motion to withdraw her plea and vacate her convictions under section 1473.7 is reversed. The matter is remanded to the trial court with directions to grant the motion and vacate the convictions.


VIRAMONTES, J.


We concur:


STRATTON, P. J.                    WILEY, J.

Filed 6/29/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BEATRIZ ADRIANA CURIEL,<br><br>    Defendant and Appellant. | B317814<br><br>(Los Angeles County<br>Super. Ct. No. PA060094)<br><br>**ORDER CERTIFYING<br>OPINION<br>FOR PUBLICATION**<br><br>**[No change in judgment]** |

THE COURT:

        The opinion in the above-entitled matter filed on June 2, 2023, and modified on June 13, 2023, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

        There is no change in the judgment.

_____

STRATTON, P. J.            WILEY, J.            VIRAMONTES, J.